UNITED STATES BANKRUPTCY COURT        **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                            :
In re:                                      :        Chapter 11
                                            :
PARKLEX ASSOCIATES, INC., et al             :        Case No. 09-12996 (MG)
                                            :
                            Debtors.        :        (Jointly Administered)
                                            :
-------------------------------------------------------------x
```

## MEMORANDUM OPINION AND ORDER DENYING NUTOVIC & ASSOCIATES' APPLICATION FOR FINAL ALLOWANCE OF FEES AND EXPENSES

*A P P E A R A N C E S :*

NUTOVIC & ASSOCIATES
*Interim Retained Attorneys for the Debtors*
488 Madison Avenue
16th Floor
New York, New York 10022
By: Isaac Nutovic, Esq.

THE SCHER LAW FIRM, LLP
*Pro Se*
1251 Avenue of the Americas
New York, New York 10020-1104
By: Austin Graff, Esq.


**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       The Debtors filed twelve separate chapter 11 petitions on May 11, 2009 ("Petition

Date"). The cases were consolidated for joint administration. (Order Granting Joint

Administration, ECF # 6.) On July 1, 2009, the Court entered a written order dismissing these

chapter 11 cases following a hearing on the same day ("Dismissal Hearing"). (*See* Order

Granting Motion to Dismiss Case, ECF # 39.) Debtors' counsel, Isaac Nutovic, Esq. of the firm

Nutovic & Associates (collectively, "Nutovic"), the retention of whom was approved by the

Court on an interim basis only on June 5, 2009 (Order Authorizing Interim Retention of Nutovic & Associates as Attorneys for Debtors and Debtors-in-Possession ("Interim Retention Order"), ECF # 24), now moves this Court for fees in the amount of $84,008.50 and expenses in the amount of $200.43, including (a) $69,832.50 in fees for work completed from May 11, 2009 through July 1, 2009 (while the case was pending) and (b) $14,076 in fees incurred in preparing and arguing the Application after the case was dismissed. (App. For Final Professional Compensation for Nutovic ("Application") at ¶ 28 (ECF # 42); Resp. to Opp. to Application at ¶ 23 (ECF # 44).) The Scher Law Firm, LLP ("Scher"), as nominee and attorneys for certain limited partners of debtor Parklex Associates L.P. ("Parkex L.P."), objects to the Application. (Affirmation of Austin Graff In Opp. to Mot. for Final Compensation Approval ("Graff. Aff.") (ECF # 43).) For the reasons explained below, the Court denies the Application in its entirety.[1]

## I.    BACKGROUND

### A.    Pre-Bankruptcy Events

Prior to filing their bankruptcy cases, the Debtors, controlled by individual debtor Fred Deutsch ("Deutsch"), managed real estate primarily to reduce investors' tax liability. (*See* Deutsch Corporate Ownership and Local Rule 1007-2 Decl., Case No. 09-12996 ("Local Rule 1007-2 Decl."), Addendum at ¶ 1 (ECF # 11).) Parklex LP managed real estate located at 114 East 32nd Street (the "East 32nd Street Property") to generate tax deductions for the benefit of certain parties ("Limited Partners") invested in the property. (*Id*.) In 1991, a Deutsch-controlled entity acquired the controlling interests in Parklex LP's general partner. (*Id*. at ¶ 2.) On May 8, 2006, Deutsch, acting as principal of Parklex LP's former general partner, Debtor Parklex

---

[1]     Scher also seeks disgorgement of the monies and a temporary restraining order ("TRO") subject to a determination in a turnover proceeding filed by Scher against Nutovic in state court ("Nutovic Turnover Action"). (Graff Aff. at ¶ 80.) The Court also denies Scher's request for the TRO and leaves any remaining issues regarding disgorgement to the state court in the Nutovic Turnover Action.

Associates, Inc. ("PAI"), allegedly sold the East 32nd Street Property for approximately $55 million. *The Scher Law Firm, LLP v. Nutovic, et al.*, No. 24026/2009, Verified Petition, New York State Supreme Court, Kings Cty (Sept. 22, 2009). (Ex. M to Graff. Aff. (hereinafter, "Ex. M") at ¶ 9.) At the sale closing, Deutsch allegedly directed that $23,080,351.63 ("$23 Million Transfer") from the sale proceeds be transferred to FAL Associates, LLP ("FAL"), another Debtor formed on May 1, 2006. (*Id*. at ¶ 10.)

Diedrich Holdkamp, one of the Limited Partners, commenced an action in Kings County State Supreme Court, captioned *Parklex Associates, L.P., et al v. Parklex Associates, et al,* No. 14514/2006, on May 11, 2006 ("State Court Action"). Holdkamp sought an accounting on behalf of all of the Limited Partners. (*Id*. at ¶ 14.) On May 26, 2006, Justice Carolyn Demarest signed an order in the State Court Action ("2006 TRO") prohibiting the "secreting or wasting of funds in any and all accounts used, maintained or in the name of Parklex Associates, L.P., or its general partner." (*Id*. at ¶ 16.) On July 12, 2006, $20,035,823.80 was allegedly transferred from FAL to DB Partners I LLC ("20 Million Transfer"), a non-debtor entity controlled by Deutsch, formed on July 5, 2006, purportedly on the eve of the disclosure of the "closing binders" from the closing of the sale of the East 32nd Street Property. (*Id*. at ¶¶ 20, 25, 29.)

The parties settled the State Court Action on April 13, 2009, conditioned on the Debtors making certain scheduled payments ("Settlement Agreement"). (*Id*. at ¶ 7(a).)[2] In the event of a default under the Settlement Agreement, a Confession of Judgment in the amount of $15,574,597.19, which had been signed by Deutsch, would be entered against Deutsch, though "the [S]ettlement [A]greement did not block the plaintiffs from taking further action against [certain] other defendants if the settlement agreement was not consummated" and it appears at least some of the other defendants in the State Court Action would be liable as obligors if the

---

[2]    The record does not contain a copy of the Settlement Agreement, but neither party denies that it exists.

Debtors failed to make certain payments due under the Settlement Agreement. (*See id*. at ¶ 7(b) and (j); Local Rule 1007-2 Decl. at ¶ 1 ("[Deutsch is] a party to an agreement pursuant to which [Deutsch] and eleven entities owned or controlled by [Deutsch] are obligated to pay or to deliver assets in excess of $14 million in settlement of a lawsuit."); Hr'g Tr. (June 30, 2010) ("Application Hr'g"Tr.") (ECF # 45) at 7:4-13 (Mr. Nutovic: "Judgment was entered against [Deutsch] for 15.6 million dollars . . . .  So to avoid having additional supplementary proceedings against them, and I think that the settlement agreement did not block the plaintiffs from taking further action against the other defendants if the settlement agreement was not consummated."); Hr'g Tr. (June 3, 2010 ("Retention Hr'g Tr.") (ECF # 32) at 10:23-11:2 (Mr. Nutovic: "[The Deutsch entities are] all being lumped in . . . the settlement agreement as obligors to the limited partner claimants."); Retention Hr'g Tr. at 12:17-18 (Mr. Nutovic: "[The Deutsch entities] all owe the same amount of money to the same people . . . .").)  The Debtors failed to make the first payment due under the Settlement Agreement.  (Ex. M at ¶ 7; *see also* Local Rule 1007-2 Decl. at ¶ 1.)

## B.    The Bankruptcy Filing

The Debtors filed their chapter 11 petitions on May 11, 2009, ostensibly because of (i) their inability to make the payments due under the Settlement Agreement and (ii) their expectation that they could assemble funds from third parties (the Debtor's wife and former real estate attorneys) who allegedly had an interest in the Debtors consummating the Settlement Agreement.  (*See* Application at ¶¶ 20-22; Application Hr'g Tr. at 7:10-13 ("[T]he [S]ettlement [A]greement did not block the plaintiffs from taking further action against the other defendants if the settlement agreement was not consummated.")

### C.    The Retention Hearing

Nutovic filed an application to be retained as counsel for all of the Debtors on May 27, 2009, indicating that his law firm "received the sum of $87,532 ($100,000 less $12,468 paid as filing fees) as a retainer ['Retainer'] . . . for services rendered and to be rendered to the Debtors" in connection with the proceedings.  (Nutovic Affirmation in Supp. of Mot. to Authorize Debtors' Retention of Nutovic and Assocs. at ¶ 6 (ECF # 10) ("Nutovic Retention Aff." and "Retention Motion", respectively).)[3]  The Nutovic Retention Aff. stated that "[t]he retainer provided is from DB Partners, LLC which is an affiliate of the Debtors, but, as reflected in the declaration of Fred Deutsch, understands that the Firm's duty of loyalty lies with the Debtors and not the Funder."  (Nutovic Retention Aff. at ¶ 8.)  The illusory "declaration of Fred Deutsch" was never filed with the Court, and never signed by Deutsch.  (Application Hr'g Tr. at 18:8-15; 18-21.)  Furthermore, Deutsch's Local Rule 1007-2 Declaration only perfunctorily mentions the existence of other Deutsch entities, without specifically mentioning any DB Partners entity, and Deutsch specifically averred he did not at that time operate any business.  (Local Rule 1007-2 Decl. at ¶ 4 ("I do not operate any business.  I own or control entities in which I have an interest which are not debtors in this court, but the value of his [sic] interest in them is less than $1 million.  They include two failed real estate investments in Venezuela and Minneapolis, two start-up technology companies with patents pending and an investment entity with cash.").)

---

[3]    There appears to be a factual issue about how much of the retainer was actually applied to prepetition amounts due.  At the hearing on the current Application, Nutovic represented he was owed approximately $13,000 for services rendered prior to the Petition Date, plus approximately $12,000 in filing fees, and contended that the credit on the retainer was approximately $75,000.  (Application Hr'g Tr. at 9:12-22.)  In the Application and in the Response to Scher's Opposition to the Application, Nutovic alleged the firm was owed $84,008.50 in fees; $69,832.50 for services rendered prior to dismissal of the case, plus $14,076 to defend his fee application after the case was dismissed.  (Application at ¶ 27; Resp. to Opp. to Application at ¶ 23.)  In the Retention Motion, Nutovic alleged that his "law firm received the sum of $87,532 ($100,000.00 less $12,468 paid as filing fees) as a retainer on account of fees for services rendered and to be rendered to the Debtors in connection with the conduct of these proceedings.  The Firm rendered services to the Debtors in the days preceding the commencement of these cases and has applied $13,946.50 leaving an approximate credit balance of $73,586.50."  (Retention Mot. at ¶ 6.)  However, at

At the June 3, 2009 hearing on the Retention Motion ("Retention Hearing"), Nutovic again stated that "the source of the [$100,000] retainer is from DB Partners, LLC" a non-debtor "wholly owned by Mr. Deutsch." (Retention Hr'g Tr. at 5:23-25.) He also represented that "all the real estate holding entities . . . just obtained . . . their assets post the closing of 2006, and the rest of the entities have no assets and have had no dealings and no operations or any activities since 2006. . . . And my understanding is that these are shell entities. No operations, at least since 2006." (Retention Hr'g Tr. at 10:19-23; 11:7-9.)

At the Retention Hearing, the U.S. Trustee's office expressed concern about Nutovic's retention, particularly with respect to Nutovic's ability to represent all twelve Debtors without a conflict arising. (Retention Hr'g Tr. at 7:22-8:3, 8-11.) The U.S. Trustee's suspicions were raised after examining several FED. R. BANKR. P. 2004 requests filed by the Limited Partners seeking to investigate the Debtors ("2004 Requests"), indicating that "monies were transferred from one entity to another or perhaps from Mr. Deutsch," or from a Debtor entity to non-debtor (Deutsch's wife). (*Id.*) The Court was equally troubled by the potential for conflict, as well as the possibility that the Retainer was the product of fraudulent conveyances. (Retention Hr'g Tr. at 22:15-19 ("If . . . there have been fraudulent conveyances, they'll be plenty of chance to explore that in due course. If Mr. Nutovic's fees are the result of improper transfers, it's going to be his problem in keeping the fees from other sources.").) Accordingly, the Court only approved the Retention Motion on an interim basis. (Retention Hr'g Tr. at 18:22-25; Interim Retention Order.) The Interim Retention Order specifically provided that "all compensation paid and

_____

the July 9, 2009 hearing in the State Court Action ("State Court July 9 Hearing"), Scher argued that the proper amount that should be a credit was $83,000, not $73,000. (Hr'g Tr. (July 9, 2009) (Graff. Aff. Ex. I) ("State Court July 9 Hr'g Tr.") at 10:16-19.) Because the Court denies Nutovic's fee application in its entirety, it does not reconcile these differences in this Order.

reimbursement of expenses incurred by [Nutovic], shall be subject to approval by this Court pursuant to 11 U.S.C. Sections 330 and 331."  (Interim Retention Order at 2.)

**D.      The Dismissal Hearing**

This Court held two additional hearings in the bankruptcy case following the Retention Hearing:  a hearing on June 23, 2009 to address the 2004 Requests ("2004 Requests Hearing") and the Dismissal Hearing on July 1, 2009, to address the Debtors' motion to dismiss the case. Following the 2004 Requests Hearing, the Court entered an order staying all discovery in connection with the case pending the Dismissal Hearing, and providing that any cross-motions for conversion or any other motions filed before 5:00 p.m., June 26, 2009, would also be heard at the Dismissal Hearing.  (Order Regarding Status of Pending Discovery and Other Matters (ECF # 37); *see also* Hr'g Tr. (June 23, 2009) ("2004 Requests Hr'g Tr.") at 18:8-15 (ECF # 38).)  No cross motions were filed, and the Court proceeded with the Dismissal Hearing on July 1, 2009. At the Dismissal Hearing, Nutovic orally requested that instead of dismissing the case, the Court should convert the chapter 11 case to a case under chapter 7.  (Hr'g Tr. (July 1, 2009) ("Dismissal Hr'g Tr.") at 6:6-10 (ECF # 41).)  The Court, however, considered the Debtors last-minute effort to convert the case to be in "bad faith," and dismissed the case on July 1, 2009. (*Id*. at 15:25-16:3; Order Granting Motion to Dismiss Case (ECF # 39).)[4]

**E.      Post-Dismissal Activities**

On July 2, 2009, one day after the case was dismissed, Justice Demarest issued a TRO in the State Court Litigation against Nutovic, prohibiting him from spending the balance of the Retainer on deposit with him. (Order to Show Cause (July 2, 2009) (Graff Aff. Ex. H).)

---

[4]      To the extent Scher argues that the Debtors' bad faith and Nutovic's potentially conflicted representation warrant a denial of the Application under *In re Angelika Films 57th Corp.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998), the Court need not reach these grounds, because, as described *infra*, Nutovic's failures to disclose and investigate the source of the Retainer and obtain this Court's approval prior to collecting fees are sufficient to warrant a complete denial of the Application.

On July 9, 2009, Nutovic admitted in open court at the State Court July 9 Hearing that the he had already spent the entirety of the Retainer.  (State Court July 9 Hr'g Tr. at 31:23.)  The transcript of the State Court July 9 Hearing also reveals that Nutovic argued that "once the [bankruptcy] case is dismissed . . . there is no preclusion to taking the money that was paid before for services rendered."  (*Id.* at 13:17-19.)  Nutovic's statement to Justice Demarest is in direct conflict with what Nutovic argued before this Court at the hearing on the current Application.  (*Compare id. with* Application Hr'g Tr. at 11:12.)  At the State Court July 9 Hearing, Justice Demarest ruled on the record that Nutovic must hold the money transferred to him from the retainer in escrow.  (State Court July 9 Hr'g Tr. at 31:19-20.)  Nutovic responded that he spent the money and answered affirmatively when asked "[y]ou have spent all of this money without approval?"  (*Id.* at 31:24-25; 32:1.)  Justice Demarest then ordered Nutovic that "[y]our direction is that any sum that you have is to be held.  And perhaps this has to be modified to indicate that whatever sums you perhaps hold out of the $100,000, that you are to place in escrow pending further order."  (*Id.* at 32:8-12.)

## F.    Turnover Proceeding Against Nutovic

On September 22, 2009, Scher filed the Nutovic Turnover Action, seeking relief "[d]irect[ing] [Nutovic] to turnover to [Scher as nominee and Claimants' Representative for the Plaintiffs and LPs in the settlement of the State Court Action] $100,000, plus interest on the monies running at 9% per annum, pursuant to CPLR ¶ 5004, from May 11, 2009."  (Ex. M.) Among other things, Scher claimed that "$100,000.00 'general retainer deposit' paid to [Nutovic] was wrongfully received and retained as a payment directly from one of [the Debtors], namely, Management Associates LLC, in violation of the requirement of Bankruptcy Code approval of professional fees under the Bankruptcy Code pursuant to 11 U.S.C. Sections 330 and

331." (*Id*. at ¶ 48.)  Scher demanded that "$100,000 must be disgorged and refunded to" the

Limited Partners, as "Judgment Creditors of Deutsch the alter ego of Management Associates

LLC," or at a minimum, that Nutovic not be permitted to retain the $87,532 as fees (not

including filing fees) paid to Nutovic without court approval, or the $73,586.50 amount admitted

as a credit, pursuant to CPLR 5225(b) and/or 5227.  (*Id*. at ¶¶ 48-50, 110.)  As Scher alleges, to

the extent Nutovic and his firm were not already on notice from the Retention Hearing, once the

Nutovic Turnover Action was filed, Nutovic was then further "on notice of the risk of his

engagement that he might not be able to retain the fees that were wrongly paid to him by

Deutsch, not only due to the fraudulent conveyances issue, but also due to the rampant conflicts

of interest that engulfed the Respondent Nutovic from the outset of his handling of all twelve

(12) of the Bankruptcy Cases for the Settling Defendants".  (*Id*. at ¶ 71.)

Nutovic did *not* disclose to this Court that the source of the Retainer was not non-debtor

DB Partners I LLC, but instead was debtor Management Associates LLC, until he filed the

current Application. (*See* Application Hr'g Tr. at ¶ 13:13-20.)  At the hearing on the Application,

Nutovic alleged that Management Associates LLC received the money for the Retainer from

"DB Partners" ("Management Associates Transfer") on the day before the petition was filed,

though his statements in the Application and the bank statements attached to the Graff Aff.

possibly indicate that that transfer took place *on* the Petition Date.  (*Compare id. with*

Application at ¶ 19 ("On May 11, 2009 before the Debtors' cases were commenced, Deutsch

arranged for $100,000 to be wire-transferred to Applicant as a retainer."); Graff. Aff. Ex. D.)

## G.    The Current Application

On June 1, 2010, nearly a year after he admitted that he spent the Retainer paying

himself, Nutovic filed the Application in this Court to recover fees and expenses incurred during

the pendency of the bankruptcy case. Scher argues that Nutovic is not entitled to fees due to his material misrepresentations, including his "failure to identify the source of the money [instead only identifying that an 'affiliate entity' or an entity wholly owned by Deutsch paid his fee] belonging to Parklex," which was "consistent with his failure to disclose to this Court that the money was subject to two (2) [TROs (one of which is presumably the 2006 TRO)] issued by [Justice Demarest in state court] that [were] supposed to prevent Fred Deutsch, one of the Debtors, from 'secreting or wasting' Parklex Associates' money." (Graff Aff. at ¶ 2.) Scher also submits, among other things, that Nutovic did not segregate funds paid to him by Management Associates LLC and spent all of the money without court approval. (*Id*.)

Nutovic acknowledges, and the record supports, that (i) he spent the Retainer prior to obtaining court approval, in violation of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure; (ii) he failed to disclose the debtor source (Management Associates LLC) of the Retainer at the Retention Hearing; and (iii) if he had a duty to investigate the source of funding of the Retainer, which the Court finds he did, and if the Retainer is a product of a fraudulent conveyance (including, but not limited to, the 23 Million Transfer, the 20 Million Transfer and/or the Management Associates Transfer), a determination which the Court leaves to the state court, Nutovic would have to disgorge any fees he obtained in and following the bankruptcy case.

1. *Nutovic Acknowledges He Spent The Retainer Without Court Approval*

Specifically, Nutovic now agrees that the balance of the retainer, after being applied to any prepetition amounts (such as the filing fee), "could not be taken or used by him absent the approval of the bankruptcy court even after the bankruptcy cases were dismissed." (*E.g.*,

Application Hr'g Tr. at 10:25-11:4; 11:12.)  He also admitted in open court on July 9, 2009 in

the State Court Litigation that he spent the Retainer.  (State Court July 9 Hr'g Tr. at 31:23.)

   2. *Nutovic Acknowledges He Failed to Disclose the Debtor Source of the Retainer at the
      Retention Hearing*

Regardless whether debtor Management Associates LLC was the payor of the Retainer

for bookkeeping purposes, shortly after the money was wired from DB Partners I, LLC (a

different entity than the "DB Partners, LLC" which Nutovic represented to be the source of the

Retainer at the Retention Hearing (Retention Hr'g Tr. at 5:23-25)), the money came from

Management Associates LLC, a debtor, and Nutovic did not disclose this to the Court until more

than a year after the Retainer was received.  (*See* Application Hr'g Tr. at 13:3-21 ("The Court:

You received your retainer from DB Partners I LLC, which was not a debtor in front of me?  Mr.

Nutovic: Correct, your Honor.  The Court: Okay.  Where did DB I LLC obtain the funds that

were used to pay your retainer?  Mr. Nutovic: I don't have specific knowledge, Your Honor . . . .

I believe it was funds related to Mr. Deutsch's prior business activities, which may have been

Parklex. . . .  [T]o be clear . . . DB Partners transferred the money to Management Associates

which was a debtor on the day before the filing, and they in turn transferred it immediately over

to me.  And Mr. Deutsch had told me that he had done that simply as a bookkeeping matter

because that entity Management Associates was where he disbursed all funds related to his

business entities.  But the source of the funds was DB Partners LLC.").)  Thus, the Court is not

convinced by Nutovic's argument that to "report to the court that it got the Retainer from one of

the Debtors would have been misleading; the proper reporting was that the money came from

DB."  (Resp. to Opp. to Application at ¶ 5.)

3. *Nutovic Acknowledges That If He Had a Duty to Investigate the Source of Funding of the Retainer, Which the Court Finds He Did, and If The Retainer is a Product of a Fraudulent Conveyance, a Determination Which the Court Leaves to the State Court, Nutovic Would Have to Disgorge any Fees He Obtained In and Following the Bankruptcy Case*

It also appears that Nutovic never inquired into the source of the funds that DB Partners I LLC paid to him as his retainer.  Nutovic directly contradicted himself about the status of Deutsch's various business entities since 2006 in an attempt to explain why such inquiry was not necessary.  (*Compare* Application Hr'g Tr. at 16:6-17 ("The Court: And did you make any inquiry in light of the allegations that Mr. Deutsch had committed a fraud, among other things, by improperly transferring twenty-three million dollars to entities that he controlled?  Did you make any inquiry about the source of the funds that DB Partners I LLC – what was the source of the funds that they paid as your retainer?  Mr. Nutovic: Your Honor, I – my understanding was – and did I make a specific inquiry, I cannot recall my conversations.  What I did understand was that all the allegations of fraudulent transfers had been as of 2006 that Mr. Deutsch had transacted substantial business since that time, that was relayed to me.  And that he had, in that period of time bought and sold securities, engaged in business, received compensation.  And to my understanding these funds were at the very worst comingled funds that represented partially the proceeds of his business activity since 2006."); Application Hr'g Tr. at 46:14-16 (DB Partners I, LLC "invested in stocks and other items at a minimum [from 2006 to 2009]" and may have "made investments in other entities as well.") *with* Retention Hr'g Tr. at 10:19-23, 11:7-9 (see *supra* Part I.C); Resp. to Opp. to Application at ¶ 17 ("Since at least 2006, none of the Debtors [thereby including Deutsch] conducted business operations."); Local Rule 1007-2 Decl. at ¶ 4 ("[Deutsch] do[es] not operate any business.").)

Nutovic also admitted that he was aware that several fraudulent conveyance claims were being asserted against Deutsch. (Application Hr'g Tr. at 26:23-27:8 (Mr. Nutovic: "I made an inquiry about the source of the funds, Your Honor. They were his funds. I understood that he was under – he had been accused of making fraudulent transfers. I did not – I didn't have the time nor did I or – honestly, Your Honor, with three years between the time of the fraudulent conveyance and the representation to me that there had been transactions and business conducted since that period of time, I don't believe I had an obligation to tell the Court we're dealing with a fraudulent conveyance over here and the source of the funds may be a fraudulent conveyance.") Furthermore, Nutovic admitted that if an attorney's funds derived from the product of a fraudulent transfer, they would be subject to disgorgement:

> The Court: [C]an you tell me whether there is any applicable law that deals with disgorgement of retainers where the source of  a – the source of the funds that the attorney receives as the retainer was proceeds of a fraudulent transfer, for example?
> . . .
> The Court: Subject to disgorgement?
> Mr. Nutovic: If the attorney had – and the normal rules of subsequent transfers, Your Honor, if value is not given then it's subject to disclosure.

(Application Hr'g Tr. at 22:11-21. *See also id.* at 26:4-11 ("The Court: Is that right. You can accept the fruits of a fraudulent conveyance as your retainer without disclosing those facts to the bankruptcy court at the time you're seeking your approval of a retention? Mr. Nutovic: Your Honor, again, you're supposing that these are the fruits of a fraudulent conveyance. And if they are perhaps – if you can meet the requirements of a constructive trust, then you are correct, Your Honor.").)

Nutovic had detailed knowledge of the purported fraudulent 2006 23 Million and 20 Million Transfers and arguably the May 2009 Management Associates Transfer when he sought to be retained as Debtors' counsel. (*See id.* at 50:6-12 ("The only fact that was not known to me

at the time [of the Retention Hearing] . . . as to the source of the funds, that as to whether or not

there was other transactions, whether you can trace directly from 2006 to 2009 the funds that I

got, because there is a gap in the account statements.").)  Furthermore, to the extent Nutovic did

not know of any of the transfers, the Court made it clear at the Retention Hearing in June 2009,

and it became even clearer when then Nutovic Turnover Action was filed in September 2009,

that Nutovic should have been, if he was not before, keenly interested in knowing the source of

funds paid him from his clients and he had a continuing duty to disclose to the court any new

information regarding the source of the Retainer.  *See* FED. R. BANKR. P. 2016.  Thus, the Court

is not satisfied by Nutovic's cursory representations that certain individual fee entries may

indicate he made some inquiry into the source of the fees with "shorthand," without regard to

any specific Debtor.  (*See id.* at 49:9-50:2.)  Nor is the Court convinced by Nutovic's

representation that he had no duty to inquire as to the source of the funds because the alleged

fraudulent transfer(s) took place three years prior to when Nutovic was paid the Retainer.  As

noted *supra* Part I.G.3, Nutovic attempted to argue as a shield against any conflicts at the

Retention Hearing that the Deutsch entities were inactive after the 2006 sale (and again alleged

the same in the Application), but changed his position at the Application Hearing, arguing that

Deutsch "transacted substantial business since [2006] . . . b[uying] and s[elling] securities,

engag[ing] in business, [and] receiv[ing] compensation."

     The Court is similarly not convinced by Nutovic's argument that the Settlement

Agreement may have expunged any claims of fraudulent conveyance against Deutsch and thus

the attorney fees could not be the product thereof.  But, as described further below, the Court

leaves it to the state court to (i) interpret the Settlement Agreement entered into in that court, and

(ii) resolve the state law issues whether the 23 Million and 20 Million Transfers and

Management Associates Transfer were fraudulent such that the Retainer was the product of those alleged fraudulent transfers.  Nutovic was on notice of such potential fraud on the Petition Date, at the Retention Hearing, and then when the Nutovic Turnover Action was filed.  These circumstances were sufficient to require Nutovic to investigate the source of the Retainer .[5]

Accordingly, as explained further below, the Court denies Nutovic's Application in its entirety due to (i) his failure to obtain Bankruptcy Court approval before spending the Retainer, particularly because he was never retained on a final basis, in violation of sections 327 and 330 of the Bankruptcy Code; (ii) his failure to reveal the source of the Retainer at the Retention Hearing in violation of his disclosure duties under sections 327 and 329 of the Bankruptcy Code, and (iii) his failure to investigate whether the funds derived from a fraudulent transfer, despite the facts that the 23 Million and 20 Million Transfers took place in 2006 and Nutovic did not receive the Retainer until 2009.  The Court leaves to the state court to determine whether, and the extent to which, the source of the Retainer was actually a fraudulent conveyance.  But, the Court will not award Nutovic any fees or expenses requested in the Application due to his failure to obtain approval prior to spending the fees, failure to disclose the correct payor of the Retainer, and failure to properly investigate the source of the Retainer.

---

[5]       Justice Demarest recently denied Scher's motion for summary judgment and DB Partners I LLC's motion to dismiss a turnover action filed by Scher against DB Partners I LLC, RBC Capital Markets Corporation ("RBCCM") and Royal Bank of Canada ("RBC") ("RBC Turnover Action") regarding the proceeds of the 20 Million Transfer because, *inter alia*, there existed a "triable issue" of fact whether RBC had knowledge of the fraud at the time the loan in question was made.  Justice Demarest set a trial date for July 6, 2010.  *See Scher Law Firm v. DB Partners I LLC*, No. 24633/09, 2010 WL 2219610, at *13 (N.Y. Sup. June 3, 2010) (Demarest, J.).  This Court's review of the docket in that action indicates the trial is still ongoing.

## DISCUSSION

**A. Nutovic Should Have Sought Approval of his Retention on a Final Basis and Approval of Fees Prior to Spending The Retainer and Dismissing the Bankruptcy Case Under Sections 327 and 330 of the Bankruptcy Code, Though the Court Still Has Jurisdiction to Hear the Application Now**

*1. The Code Requires An Attorney's Retention and Fee Application To Be Approved Prior to Awarding Any Fees*

Section 327(a) of the Bankruptcy Code provides that "[e]xcept as otherwise provided in this section, the trustee [or debtor-in-possession; *see* 11 U.S.C. § 1107], with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  Retroactive approval of professional employment will only be granted in "extraordinary circumstances," which may be established by examining "whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service had initial approval not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors." *In re F/S Airlease II, Inc.*, 844 F. 2d. 99, 105-07 (3d Cir. 1988) (citing *In re Arkansas*, 798 F. 2d 645, 650 (3d Cir. 1988)) (denying retroactive approval of fees where counsel waited a year to seek to be retained and seven months after completing services to apply for fees and expenses).

The court may award fees to professional persons retained under section 327 pursuant to section 330 of the Bankruptcy Code.  11 U.S.C. § 330.  Section 330 provides in relevant part:

> After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328 and 329, the court may award . . .
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by an such person; and

16

(B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

In determining reasonable compensation, section 330 directs the court to consider:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time which the services was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).[6]

The Court has an independent duty to review fee applications and evaluate the compensation requested. *In re Keene*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997). *See also Dery v. Cumberland Cas. & Sur. Co. (In re 5900 Assocs. Inc.)*, 468 F.3d 326, 331 (6th Cir. 2006) (Finding debtor not insolvent for purposes of fraudulent conveyance statute because attorney's claim for services rendered during prior bankruptcy would be unenforceable: "[a]s an attorney appointed under 11 U.S.C. § 327, [the attorney] was required to seek approval of his fees from the court under 11 U.S.C. § 330. Because he did not do so, his fees [from prior bankruptcy] are

---

[6]   There are also several other criteria concerning, *inter alia*, expense limits and task descriptions embodied in the Bankruptcy Rules and the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases set forth in this district's bankruptcy General Order M-389 that the Court considers in evaluating fee and expense applications.  Because the Court is denying Nutovic's Application in its entirety, and does not engage in a line-by-line analysis of the billing records attached to the Application, it will not elaborate further on these criteria in this Opinion and Order.

unenforceable . . . .") (citing *Jensen v. Gantz (In re Gantz),* 209 B.R. 999, 1002 (10th Cir. BAP

1997) (attorney entitled only to fees awarded by the bankruptcy court under § 330); *In re Jeanes,*

No. 01-00760, 2004 WL 1718093, at *2 (Bankr. N.D. Iowa,  June 17, 2004) ("Because § 330(a)

requires court approval to create the obligation to pay the attorney's fees, absent court approval

neither the debtor nor the estate is ever liable.  Court approval under § 330(a) is what creates the

liability, not the performance of the services.") (internal citations omitted); *In re Marin,* 256 B.R.

503, 507 (Bankr. D. Colo. 2000) ("*There is no other way for an attorney to be paid!* An attorney

who extracts payments from debtors other than pursuant to proper disclosure, or to allowance

under section 330, stands in violation of the provisions of the Bankruptcy Code, and may

properly be stripped of all fees.") (emphasis in original)).

　　　"A bankruptcy court confronted with a professional's violation of the Code and/or Rules

[including sections 327, 329 and 330] is afforded a 'great deal of latitude in fashioning an

appropriate sanction.'"  *Vergos v. Gonzales (In re McCrary and Dunlap Constr. Corp.),* 79 Fed.

Appx. 770, 779 (6th Cir. 2003) (citing *Mapother & Mapother, P.S.C. v. Cooper (In re Downs),*

103 F.3d 472, 478 (6th Cir. 1996)).  Moreover,

> [n]oncompliance with the provisions of the Code and Rules that govern the
> employment and compensation of professionals can range from inadvertent,
> technical violations, which may call for the imposition of no sanction whatsoever,
> to intentional violations, which may warrant complete disgorgement of fees.
> Caselaw establishes that the benchmark for determining the severity of the
> sanction to be imposed is willfulness . . . .  [T]he bankruptcy court should deny all
> compensation to an attorney who exhibits a willful disregard of his fiduciary
> obligations to fully disclose the nature and circumstances of his fee arrangement
> under § 329 and Rule 2016.

*Id.* (internal quotation marks omitted).  The *Vergos* court acknowledged that "[p]recedent also

makes clear that non-willful violations of the Code and Rules generally do not call for imposition

of the harsh sanction of complete disgorgement of fees," but "a finding of willfulness must [not]

18

in all instances precede an order requiring complete disgorgement of fees." *Id.* Instead, "[d]isgorgement may be proper even though the failure to [comply with the Code and Rules] resulted . . . from negligence or inadvertence." *Id. (*quoting *Henderson v. Kisseberth (In re Kisseberth),* 273 F.3d 714, 721 (6th Cir.2001)). It determined that counsel's "sincere apology" to the bankruptcy court was irrelevant to the "willfulness" determination. *Id.* at 780. "Rather, the critical issue is whether [the law firm] acted in willful disregard of the requirements imposed by Code §§ 330 and 331 *at the time it accepted the Postpetition Payments*" on which "the bankruptcy court's findings [we]re incomplete." *Id.* at 780 (emphasis in original). Specifically, the court remanded to the bankruptcy court to determine "whether [the law firm] was put on notice by [a second motion for reconsideration of a retention order] that its receipt of [certain] [p]ostpetition [p]ayments was in violation of the Code," pointing to various correspondence and an objection to the Disclosure Statement (for failure to account for recovery of amounts purportedly fraudulently transferred to the attorneys) that "could have been reasonably interpreted by [the law firm] as simply a continuing objection by the [U.S.] Trustee to the firm's initial retention." *Id.* at 781.

## 2. *The Bankruptcy Court Has Jurisdiction Over Post-Dismissal Fee Applications*

Furthermore, as the *Dery* court determined, 468 F.3d at 331, the bankruptcy court retains jurisdiction over fee applications after a case has been dismissed. *See also In re Elias*, 188 F.3d 1160, 1164 (9th Cir. 1999) ("[A]fter dismissal a bankruptcy court, without reopening, retains jurisdiction 'to dispose of ancillary matters such as an application for an award of attorney's fees for services rendered in connection with the underlying action.'"); *In re Kent Funding Corp.*, 290 B.R. 471, 478 (Bankr. E.D.N.Y. 2003) ("In addition to the Court's power to entertain the Debtor's motion to reopen the case under Rule 60(b), the Court also retains ancillary jurisdiction

19

to entertain a post-dismissal motion to enforce a fee agreement between a debtor and its

bankruptcy counsel."); *In re Fox*, 140 B.R. 761, 764 (Bankr. D.S.D. 1992) ("The court can

approve the request for compensation and reimbursement of expenses even though the case was

previously dismissed."). *See also Matter of Lowe*, 97 B.R. 547, 548 n.4 (Bankr. W.D. Mo. 1987)

("Attorney's fees awards, by reason of the attorneys' being officers of the court and subject to

the court's disciplinary powers, continue to be *in custodia legis* even after the termination of a

case in which they have been awarded or collected.").

3.  *Nutovic Violated Sections 327 and 330 of the Bankruptcy Code by Spending the Entire Retainer After the Case Was Dismissed*

Here, while Nutovic has filed an application pursuant to section 330 of the Bankruptcy

Code, he was never finally retained by this Court under section 327, and collected the fees more

than a year ago before applying to this Court for compensation.  He has failed to demonstrate any

"extraordinary circumstances" why *nunc pro tunc* approval of his retention on a final basis or his

fees going back more than a year would be appropriate.  The Interim Retention Order

specifically required that "all compensation paid and reimbursement of expenses incurred by

[Nutovic], shall be subject to approval by this Court pursuant to 11 U.S.C. Sections 330 and

331."  (Interim Retention Order at 2.)  He was put on notice by Justice Demarest in July 2009,

and again in September 2009, when the Nutovic Turnover Action was filed, that it was

inappropriate to spend the Retainer until he obtained this Court's approval.  The delay and

blatant misuse of the Bankruptcy Code and clear violation of Sections 327 and 330 is

unacceptable, and is sufficient standing alone to deny Nutovic's Application in its entirety.

Furthermore, Nutovic never sought to have his retention approved on a final basis, and thus was

not properly retained under section 327 such that he would be entitled to recover any fees now or

even in July 2009.

20

**B. Failure to Disclose the Source of A Retainer Is Sufficient To Deny A Fee Application Before or After A Case is Dismissed**

*1. Section 329 of the Bankruptcy Code Requires Detailed Disclosure of the Source of Prepetition Retainers*

The Court also finds that Nutovic's failure to disclose the source of his retainer, debtor Management Associates LLC, until this Application was filed warrants a complete denial of the Application. Under 11 U.S.C. § 329(a), "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." FED. R. BANKR. P. 2016 requires disclosure of any payments previously made to the applicant and of the existence of any compensation agreement between the applicant, their client and any third party who will share the compensation, and specifically requires "[a] supplemental statement . . . within 15 days after any payment or agreement not previously disclosed." *Id.* FED. R. BANKR. P. 2017 permits the court on its own initiative, or on motion by a party in interest, to decide "whether payment[s] of money or . . . transfer[s] of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor . . . to an attorney for services rendered or to be rendered" as well any payments made after the entry of the order for relief to attorneys by the debtor for "services in any way related to the case" are "excessive."

21

"Section 329 and Rule 2016 are fundamentally rooted in the fiduciary relationship

between attorneys and courts." *Downs*, 103 F.3d at 480.  Thus, "[c]ounsel's fee revelations must

be direct and comprehensive.  Coy or incomplete disclosures which leave the court to ferret out

pertinent information from other sources are not sufficient." *In re Perrine*, 369 B.R. 571, 580

(Bankr. C.D. Cal. 2007) (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)).

"Compensation may be denied, particularly when an attorney intentionally misrepresents

facts [required to be disclosed under section 329] and deceives the court.  The bankruptcy court

may order disgorgement of fees, award costs or impose other penalties when an attorney is found

to have committed a fraud on the court."  3 COLLIER ON BANKRUPTCY 329.04[1][b] (citing *In re

Teknek*, 394 B.R. 884 (Bankr. N.D. Ill. 2008); *Bezanson v. Gaudette (In re R & R Assocs.)*, 248

B.R. 1 (Bankr. D.N.H. 2000)).  In penalizing such frauds on the Court, "[a] bankruptcy court

does not have to calculate how much the unethical conduct depleted the value of the attorney's

service, but may, in its discretion, deny compensation in whole or in part.  It may also order

disgorgement of all fees already paid." *Id.* (citing *In re McGregory*, 340 B.R. 915, 923 (B.A.P.

8th Cir. 2006); *In re Mahendra*, 131 F.3d 750, 759 (8th Cir. 1997); *In re SRC Holding Corp.*,

364 B.R. 1, 47 (D. Minn. 2007)).[7]  *See also Vergos*, 79 Fed. Appx. at 778 (sanctions appropriate

for failure to disclose, but the appellate panel was "unable to determine on the present record

---

[7]     *SRC Holding Corp.* has since been reversed by the Eighth Circuit on the grounds that the law firm's
representation of the debtor in a state court lawsuit brought by a bankruptcy estate claimant who had agreed to fund
certain loans to the debtor did not breach its fiduciary duties to the debtor, even where one of the attorneys was
arguably a fact witness to the loan closing. *Leonard v. Dorsey & Whitney LLP (In re SRC Holding Corp.)*, 553 F.3d
609, 631 (8th Cir. 2009).  The bankruptcy estate claimant had also filed an adversary proceeding against the law
firm alleging claims premised on the theory that bankruptcy estate claimant was either the law firm's client or a
third-party beneficiary of the services provided by the law firm, which the chapter 7 trustee joined, asserting
indemnity and contribution claims for any recovery by the bankruptcy estate claimant against the law firm. *Id.* at
611.  The Eighth Circuit determined that "the Minnesota Supreme Court would not hold a lawyer liable for failure to
disclose a possible malpractice claim unless the potential claim creates a conflict of interest that would disqualify the
lawyer from representing the client" and there was no breach of fiduciary duty, as "based on the language of the
participation agreement [for the loans], that there was not a substantial risk that [law firm's] representation of [the
debtor] in [the] state-court action was materially and adversely limited by [the law firm's] own interests." *Id.* at
629-30.

whether the bankruptcy court abused its discretion [in imposing only a small sanction (as the district court found), as opposed to ordering complete disgorgement, as the district court ordered] and thus must remand this case for additional factual findings by the bankruptcy court").

> 2. *The Reasonableness of Prepetition Retainers is Reviewable After a Case is Closed*

Prepetition retainers and the required attendant disclosures are also reviewable after a case has been closed: "[g]enerally the payment, or agreement to pay, should be examined prior to the closing of the estate. However, a closed estate may be reopened for the purpose of making a motion to recover excessive compensation paid by a debtor for services rendered in conjunction with the case if the payments were concealed and not revealed by the statement required to be filed. Such procedure would be especially warranted if the size of the payment is substantial." 3 COLLIER ON BANKRUPTCY ¶ 329.05[2].

> 3. *Nutovic's Failure to Disclose the Source of the Retainer, Combined With Deutsch's Failure to Provide More Detailed Information about DB Partners I, LLC in the Local Rule 1007-2 Decl. Are Sufficient to Warrant a Denial of the Application*

Here, like the attorney in *Vergos,* Nutovic misrepresented that the source of the retainer was DB Partners LLC[8] at the Retention Hearing. Regardless whether Management Associates LLC was merely a vehicle for paying Deutsch-entity expenses, no one disputes that it was the last source of the Retainer before it was wired to Nutovic. Nor did Nutovic properly disclose Deutsch's interest in DB Partners I, LLC until the current Application, despite a cursory mention in the Local Rule 1007-2 Affidavit of an "investment entity with cash" (Local Rule 1007-2 Aff. at ¶ 4), which further misled the Court regarding the source of the Retainer in June 2009. Such failures are particularly unreasonable in light of the approximately twenty-four hours Nutovic

---

[8]    As noted *supra* Part I.G.2, Nutovic later admitted that the name of the non-debtor entity to which he was referring as the alleged source of the Retainer was in fact "DB Partners I, LLC."

spent preparing the Debtors' schedules and statements.  (*See* Application at Ex. C.)  As such,

they constitute additional grounds warranting a complete denial of the Application.

### C. Nutovic Had a Duty to Investigate the Source of the Retainer Where There Is a Reasonable Suspicion That the Funds Derived From a Fraudulent Transfer

#### 1. Attorneys Must Investigate the Source of Funds Received Where A Reasonable Lawyer Would Question the Client's Intent In Paying the Fees

The Court also finds that Nutovic had a duty to investigate the source of the retainer at

least after the June 2009 Retention Hearing and again when the Nutovic Turnover Action was

filed, if not prior to the Petition Date.  Nutovic's failure to investigate further warrants denying

his Application.  Outside of the bankruptcy context, courts in this district have determined that

"lawyers who receive a conveyance under circumstances that should cause them to inquire into

the reasons behind the conveyance must diligently do so, lest they be charged with knowledge of

any intent on the part of transferor to hinder, delay, or defraud.  A lawyer who blindly accepts

fees from a client under circumstances that would cause a reasonable lawyer to question the

client's intent in paying the fees accepts the fees at his peril."  *S.E.C. v. Princeton Economic Int'l

Ltd.*, 84 F. Supp. 2d 443, 446-47 (S.D.N.Y. 2000) (citing *Gala Enters., Inc. v. Hewlett Packard

Co.*, 989 F. Supp. 525, 532 (S.D.N.Y. 1998)).  Both *Princeton Economic International Ltd.* and

*Gala Enterprises Inc.* concerned alleged securities fraud in which company funds were used to

pay law firms hired to represent the companies' respective principals.  In *Princeton Economic

International Ltd.*, the district court granted a TRO, requiring, *inter alia*, the defendants (two

corporate entities and their individual principal) and their "attorneys" to "hold and retain within

their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment,

dissipation, concealment, or other disposal of any assets, funds or other properties . . . of

[d]efendants currently held by them or under their control," specifically exempting "reasonable

24

attorney's fees not to exceed $10,000." *Id.* at 444. The entity's principal hired the law firms to represent him individually between the execution of a search warrant related to the alleged securities fraud and the entry of the TRO, but the retainers came from the two corporations. The court determined that "[a]ll the law firms were aware of the nature of the government's investigations into [individual's] business dealings, and therefore, at the very least, in addition to knowing they were not being paid by the client, should have been aware of the possibility that they were being paid with corporate funds obtained by fraud" which the individual principal could not "use . . . to pay for his defense." *Id.* at 447 (citing *S.E.C. v. Quinn*, 997 F. 2d 287, 289 (7th Cir. 1993) ("[A] swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.")) The court did not permit the firms to "retain the funds received directly or indirectly from [the entities] for [the individual's representation]." *Id.* at 446.

Similarly, in *HBE Leasing Corp. v. Frank*, 48 F. 3d 623, 633-34 (2d Cir. 1995), certain leasing companies that prevailed in a civil RICO fraud action sought to set aside transfers from the judgment debtor to its attorneys as fraudulent conveyances of funds the corporation judgment debtor paid for legal services not for it, but for its co-defendants in the RICO action, due to an alleged lack of "fair consideration" and/or "actual" fraudulent intent under the New York Uniform Fraudulent Conveyance Act. The Second Circuit reversed the district court's dismissal of the claims against the attorneys. *Id.* at 639. While determining there was in fact "fair consideration," since the joint defense benefitted all parties, the Second Circuit panel also determined that the district court ignored the possibility that the transfer was fraudulent because the corporate entity "paid the Attorneys' fees with *actual intent* to defraud its creditors," though acknowledging that "a transfer motivated by actual fraudulent intent may not be voided if a

transferee who paid fair consideration did not have actual or constructive knowledge of such intent." *Id.* (emphasis in original). It determined that there were genuine factual disputes whether the debtor had fraudulent intent in paying the fees (as corporate defendant paid fees at the direction of its controlling shareholder who then did not have to pay for his own defense), and the attorneys' knowledge of that intent. *Id*. at 639-40. Specifically, even if there was a purchaser for fair consideration, "[c]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such an inquiry." *Id.* at 636.

Conversely, in *Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 233-34 (3d Cir. 2003), a chapter 7 trustee sought to recover six fee payments received by law firms from the personal bank account of debtor's non-debtor wife, which allegedly originated from a debtor trust account, to represent the chapter 7 debtor when the case was converted from a chapter 11 case, after the law firms specifically informed the debtor that any fees once the case was converted needed to be paid by non-estate sources. In response to the chapter 7 trustee's motion for summary judgment, "the law firms filed affidavits of the responsible attorneys, which set forth the facts recounted above and averred that they had no knowledge that the . . . trust was the source of the funds used by [the wife] to pay the fees at issue. Neither questioned [the wife] about the source of the funds because they believed they had no reason to do so"; the court determined these affidavits were *prima facie* evidence that they had no reason to know that the challenged fees "came from the trust and the Trustee had not satisfied its burden of producing sufficient evidence to support a contrary inference." *Id.* at 234-35. The court determined that the trustee's only remedies were sections 549 and 550 of the Bankruptcy Code, not section 327,

329 and 330, but the firms were transferees "for value, . . . in good faith, and without knowledge

of the voidability of the transfer" within the meaning of § 550(b)(1).  *Id.* at 235, 241.  The Third

Circuit "accept[ed], as the controlling law" that

> [a] transferee has knowledge if he 'knew facts that would lead a reasonable
> person to believe that the property transferred was recoverable.'  In this vein,
> some facts suggest the underlying presence of other facts.  If a transferee
> possesses knowledge of facts that suggest a transfer may be fraudulent, and
> further inquiry by the transferee would reveal facts sufficient to alert him that the
> property is recoverable, he cannot sit on his heels, thereby preventing a finding
> that he has knowledge.  In such a situation, the transferee is held to have
> knowledge of the voidability of the transfer.

*Id.* at 236 (internal citations omitted).  Still, the court qualified its holding to determine that

"[s]ome facts strongly suggest the presence of others; a recipient that closes its eyes to the

remaining facts may not deny knowledge.  But this is not the same as a duty to investigate, to be

a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent

conveyance in the chain.  'Knowledge' is a stronger term than 'notice'[.]  A transferee that lacks

the information necessary to support an inference of knowledge need not start investigating on

his own."  *Id.* at 237 (quoting *Bonded Fin. Servs. v. European Amer. Bank*, 838 F.2d 890, 898

(7th Cir. 1988)).  The court then determined that notice from the trustee that he was investigating

whether they were being paid from estate assets was not sufficient to give them "knowledge of

the voidability," nor did such notice " impose[ ] a duty on [the attorneys] to begin their own

investigation."  *Id.*  Instead, "the issue is whether the facts known to the firms and the reasonable

inference to be drawn from those facts would affirmatively suggest to a reasonable person in

their position that they were receiving assets of the estate.  If not, there would be no duty to

investigate."  *Id.*  There was no duty to investigate because "[t]he record demonstrat[ed] that the

members of each firm handling their respective representations were sophisticated, experienced

lawyers who understood the risk entailed in being paid with estate assets and specifically focused

on that issue." *Id*. at 238. Furthermore, "[c]onducting an investigation and attempting to

identify and recover estate assets are responsibilities of the Trustee and the fact that he is

pursuing those responsibilities does not suggest that any particular asset is recoverable by the

Trustee." *Id*. at 239. "[T]he Trustee came forward with no probative evidence of the firms being

aware of the facts that would affirmatively suggest they were receiving assets from the estate."

*Id*. Furthermore, "[w]hile it [wa]s true that a bankruptcy court may order the disgorgement of

fees received by an attorney when he or she has ignored reporting and court approval duties

imposed by the Code, the Trustee has identified no statutory sections that imposed such duties on

the firms in the situation before us. While the Trustee contends that [law firm] failed to comply

with the reporting requirement of § 329 and that both firms received fees from the estate in

violation of § 330, we, too, conclude that those provisions are inapposite." *Id*. at 240 (internal

citations omitted). It noted "[t]he purpose of §§ 327 and 330 is to allow for the necessary

participation of lawyers in the bankruptcy process, while remedying the lack of incentive, on the

part of the debtor, to negotiate attorney's fees and to find representation at a cost-effective level."

*Id*. at 241.

> 2. *Taken Together With His Other Failures to Disclose, Nutovic Violated His Investigatory Obligations With Respect to the Source of the Retainer*

Here, Nutovic was clearly on notice of the purported fraudulent transfers (including the

23 Million, the 20 Million, and the Management Associates Transfers)–he was very familiar with

the details of the Settlement Agreement on the Petition Date, seemingly filing the bankruptcy

petitions to permit Deustch and the related entities additional time to comply with the Settlement

Agreement obligations. *See supra* Part I.B. Nutovic admits that he would have to turn over the

funds if they were the subject of a fraudulent conveyance. *See supra* Part I.G.3. This Court

raised the issue of possible fraudulent conveyances at the June 2009 Retention Hearing, and it

28

was front and center in the Nutovic Turnover Action filed in September 2009. *See supra* Part I.C

and F. Nutovic merely argues he had no duty to investigate the source of the Retainers because

the alleged fraudulent transfers took place in 2006, and he received the funds in 2009; however,

in doing so, he relies on a representation that the Deutsch entities were conducting business from

2006 to 2009, a representation that directly contradicts his statements on the record regarding

Deutsch at the Retention Hearing and in the Application. *See supra* Part I.G.3.

The Court finds that whether the 23 Million Transfer, the 20 Million Transfer and the

Management Associates Transfer were fraudulent conveyances are questions more appropriately

resolved by Justice Demarest in the Nutovic Turnover Action, or one of the other related matters

already pending before her.[9] This Court determines in any event that Nutovic's failure to be

forthcoming with respect to the source of the Retainer, his failure to obtain court approval prior

to spending the Retainer, and his failure to properly investigate the source of the Retainer

warrant a denial of the Application before this Court, particularly because (i) the Court raised

similar questions at the June 2009 Retention Hearing, (ii) Nutovic never applied for retention on

---

[9]     Collier states that "[a] state court has no jurisdiction to reexamine the transfer of property to an attorney in a bankruptcy case." 3 COLLIER ON BANKRUPTCY 329.05[3] (citing *In re Wood*, 210 U.S. 246 (1908); *Swartz v. Frank*, 183 Mo. 438 (1904)). However, here, whether the Management Associates Transfer and the subsequent transfer to Nutovic were fraudulent conveyances depend on whether the 20 Million and 23 Million Transfers were fraudulent. The issues whether transfers among the various Debtors were fraudulent are already before Justice Demarest, and are more properly resolved by her since this case has been dismissed and the Debtors are no longer in bankruptcy. *See* 11 U.S.C. § 349(b) ("Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title – (1) reinstates – any transfer avoided under section . . . 544 [which applies to state law fraudulent conveyance claims] [and] . . . (3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title"); *Amrel Laminates, Inc. v. The Lomas and Nettleton Co. (In re Income Prop. Builders, Inc.)*, 699 F.2d 963, 965 (9th Cir. 1983) ("11 U.S.C. § 349, treating the effects of a bankruptcy, obviously contemplates that on dismissal a bankrupt is reinvested with the estate, subject to all encumbrances which existed prior to the bankruptcy. After an order of dismissal, the debtor's debts and property are subject to the general laws, unaffected by bankruptcy concepts."); 4 NORTON BANKRUPTCY LAW AND PRACTICE 63:4 (3d ed. rev. 2010) ("In order to exercise the avoidance powers under Code section 544, in the absence of a consent by a targeted defendant, the trustee must file a complaint under Bankruptcy Rule Part VII's adversary proceedings."). *See also Aheong v. Mellon Mortg. Co. (In re Aheong)*, 276 B.R. 233, 239-40 (9th Cir. 2002) ("[A]fter dismissal of the underlying case the bankruptcy court retain[s] jurisdiction to 'interpret' its orders entered prior to dismissal and 'to dispose of ancillary matters such as an application for an award of attorney's fees for services rendered in connection with the underlying action' but not to grant 'new relief independent of its prior rulings.'") (quoting *Tsafaroff v. Taylor (In re Taylor)*, 884 F.2d 478, 481 (9th Cir. 1989)).

a final basis, and (iii) Nutovic did not seek fees until approximately one year after he was

retained and eleven months after his services were complete (other than the *exorbitant*

approximately $14,000 in fees he seeks for defending his fee application postpetition which

provided absolutely no benefit to the estate).[10]

## CONCLUSION

For the reasons explained above, the Court DENIES Nutovic's Application in its entirety.

**IT IS SO ORDERED.**

Dated:   New York, NY
         September 2, 2010                       _____
                                                        /s/ Martin Glenn
                                                 HONORABLE MARTIN GLENN
                                                 UNITED STATES BANKRUPTCY JUDGE

---

[10]     While attorneys may be awarded fees for preparing fee applications "based on the level and skill
reasonably required to prepare the application," 11 U.S.C. § 330(a)(6), the court may reduce or disallow a request if
the services provide no real benefit to the estate. *In re Keene*, 205 B.R. at 696.  The Court finds that Nutovic's time
spent defending the current Application after the case was dismissed provided no benefit whatsoever to the estate,
particularly because it is denying the remainder of the Application in its entirety as well.